Filed 9/10/13  Soriano v. Chew CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| NORLITO SORIANO,<br><br>   Plaintiff and Appellant,<br><br>   v.<br><br>RONALD H. CHEW,<br><br>   Defendant and Respondent. | H038003<br>(Santa Clara County<br>Super. Ct. No. CV149534) |

At trial plaintiff Norlito Soriano failed to convince the court that respondent Ronald Chew was liable on multiple causes of action arising from the promise of foreclosure relief in a scheme initiated by Chew's co-defendants, World Marketers, Inc. and its principal, C. Bryan McCord.  The co-defendants, having failed to answer the complaint, were subjected to a default judgment and are not parties to this appeal.

Plaintiff seeks review of the judgment in Chew's favor.  He contends that the court's statement of decision was deficient and that the court's factual findings were unsupported by substantial evidence.  We will affirm the judgment.

*Background*

World Marketers, the entity responsible for the promotional materials on which plaintiff relied, was owned by defendant McCord.  McCord's legal counsel was respondent Chew.  Chew and McCord held meetings in 2008 to discuss a new program McCord wanted to set up to help homeowners stay longer in their homes when facing

foreclosure.  In his deposition testimony[1] McCord described his service as a "stall tactic," a way clients could buy time to avert foreclosure for "anywhere from 12 to 18 months," by filing lawsuits against their lenders.  McCord developed a set of marketing materials that included "Frequently Asked Questions" (FAQs) Chew had been using in his own law practice.  Chew reviewed a "Consulting Services Agreement" prepared by McCord to use in his program.  According to McCord, Chew also reviewed the FAQs and told him they were legally "acceptable."  Chew, however, denied this fact and insisted that someone associated with McCord had taken the FAQs from Chew's website.

Plaintiff became a client of World Marketers in 2008, after attending several seminars run by McCord about the "mortgage referendum program."  Through these presentations and in subsequent meetings with McCord, plaintiff was told that the program provided for legal counsel.  Plaintiff also received the FAQs that McCord had adapted from the ones that had been on Chew's website.  The FAQs described a process that included the following:  "If you are not in foreclosure, you are given a letter to send to your lender. . . .  [¶]  If the lender does not agree to settle the loan after 20 days, then you send them a Notice of Default and give them an opportunity to cure their default.  After the Default letter, if they still don't respond, *we have an attorney send them* a final Demand Letter in an attempt to get them to settle without going to court. . . .  [¶]  [I]f no settlement is offered, or you are not happy with the terms of their offer, *then our attorneys will file a lawsuit against the lender.* . . . Many times THIS will bring the lender to negotiate a settlement.  The filing of the lawsuit concludes Phase One of the TILA process.  [¶]  *If continuing court action is necessary, our attorneys will carry this into court.*  At that point you have entered into Phase Two."  (Italics added.)

---

[1] Attempts to subpoena McCord for trial were unsuccessful.  During trial the court allowed counsel to obtain his testimony by deposition.

In December 2008 plaintiff signed the Consulting Services Agreement and paid World Marketers $2,500 based on his understanding that an attorney would be provided to assist him in any court action.[2] With the same understanding he gave World Marketers another $2,500 in early January 2009. The next month he gave the company another check for $12,500, which was described as a "cash infusion," based on McCord's explanation that it was an investment in the "mortgage referendum program." Plaintiff then received a copy of a complaint filed in pro per in federal district court. He asked why his own address, not his lawyer's, was on the complaint. McCord did not respond to this inquiry.

The following month plaintiff received a letter from Chew thanking him for retaining Chew's law office to represent him and advising him on the next steps. When plaintiff, happy to have obtained counsel, showed a copy of the letter to McCord, the latter said nothing but left with the letter. On March 30, 2009, Chew wrote plaintiff another letter informing him that the previous letter had been sent to him by mistake; in fact Chew did not represent plaintiff.

Because plaintiff did not know how to handle his federal action by himself, he had to dismiss it. He lost his property to foreclosure in March 2010.

Plaintiff filed this action on August 11, 2009, against World Marketers, McCord, and Chew. Of the 15 causes of action in the complaint, 14 were against Chew:[3] fraud

---

[2] Chew takes pains to emphasize that the Consulting Services Agreement itself did not state that plaintiff would be represented by an attorney. It has not escaped our notice, however, that the agreement did not identify *any* specific services; it promised only that World Marketers would "provide the real estate consulting service pursuant to this Agreement." The only obligations described in the document were those of *plaintiff*.

[3] The 10th cause of action was labeled as bad faith against World Marketers, but its substance accused both World Marketers and Chew of breaching their duty of "good faith and fair dealing" by failing to provide "the promised legal services." Similarly, the 11th cause of action for money had and received accused both World Marketers and Chew of accepting plaintiff's money and then failing to "provide the promised services."

(comprising four subordinate counts); unlawful business practice, in violation of Business and Professions Code section 17200; misrepresenting legal services, in violation of the Consumers Legal Remedies Act (Civ. Code, § 1770); financial abuse of an elder, in violation of the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, §§ 15610.30, 15657.5); criminal elder abuse, in violation of Penal Code section 368; violation of the federal Racketeer Influence and Corrupt Organization Act (18 U.S.C §§ 1961 et seq.) (RICO); aiding and abetting each other defendant's wrongful conduct; breach of fiduciary duty; bad faith; money had and received; refusal to provide promised "loan assistance services" in violation of a joint venture obligation; conversion; intentional infliction of emotional distress; and negligence.

The action was tried by the court on March 1-3 and July 26, 2011. After both parties rested, Chew made an oral motion for a directed verdict. The court, skeptical of the coincidental nature of the same material being on Chew's website and in McCord's FAQs, determined that McCord's testimony was necessary on the issue of whether there was a joint venture between the defendants. Consequently, the court reserved its ruling on Chew's motion for a directed verdict and granted a continuance, but it acquiesced in Chew's request that McCord's testimony be obtained through a deposition. After receiving that testimony and hearing argument on the motion, the court denied the motion.

On November 15, 2011, default judgments for $281,875.00 were entered against McCord and against World Marketers. On the same day, the court issued its tentative decision finding no liability of Chew. Plaintiff objected and proposed alternative findings on all causes of action; but on January 4, 2012, the court filed its judgment and final statement of decision in Chew's favor. This appeal followed.

*Discussion*

Although it is difficult to comprehend plaintiff's legal analysis, he appears to contend that (1) the court's statement of decision did not address all causes of action

4

against Chew and explain its findings on all material issues; and (2) a de novo review of the "undisputed facts" supports a finding in his favor on the causes of action for agency, conspiracy, and aiding and abetting. Guided by the proper standards of review, we find no basis for reversal in plaintiff's arguments.

*1. Statement of Decision*

The court issued a tentative decision which invited the parties to submit objections pursuant to California Rules of Court, rule 3.1590(g). Chew's disingenuous assertion notwithstanding,[4] plaintiff did submit a response in which he objected as follows: "1) Lack of rulings on each of the causes of action; [¶] 2) Factual findings inconsistent with the trial transcript or exhibits; [¶] 3) Lack of findings on causation and damages, including punitive damages; [¶] 4) A finding that reliance is required, when under Bus. & Pro. Code § 17200, reliance is not required; [¶] 5) the Court's finding on agency, conspiracy, joint venture, partnership and aiding and abetting. . . . The overwhelming evidence shows that such relationships existed." Without identifying the applicable cause of action, plaintiff objected again that reliance was not required, "since Plaintiff testified on direct examination to the contrary." He also asked for rulings on the following issues: the factual grounds for the alleged Business and Professions Code section 17200 violation; whether Chew had engaged in an illegal enterprise in violation of RICO; whether Chew owed plaintiff a duty of care; whether Chew had rebutted the presumptions that he intended the consequences of his voluntary and unlawful acts; whether Chew had a written attorney-client fee agreement with McCord and World

---

[4] Chew states that plaintiff's challenge to the statement of decision is raised for the first time on appeal, as he "did not bring this matter to the Trial Court's attention during the Trial or Judgment phase of the action." This is misleading at best. Plaintiff could not have challenged the *final* statement of decision, as it was made part of the judgment. What Chew avoids acknowledging is that plaintiff did contest the tentative statement of decision. Clearly, the issue cannot be deemed waived or forfeited.

Marketers; and whether Chew lacked credibility in light of his admissions of "false and/or misleading discovery responses, and a false and misleading website disclosure."

The trial court acknowledged plaintiff's objections in its final statement of decision. It explained, however, that all of the causes of action against Chew were rooted in the theories of agency, conspiracy, and aiding and abetting. Accordingly, rather than discuss every element of all 14 of the causes of action asserted against Chew, the court addressed the predicate relationship between Chew and the other defendants. We see no error in the court's exercise of judicial economy by resolving the underlying issues on which all the allegations against Chew depended.

As plaintiff alone notes (Chew having unwisely relied on the defenses of waiver and implied findings), a trial court's statement of decision must explain "the factual and legal basis for its decision as to each of the principal controverted issues at trial." (Code Civ. Proc., § 632.) The statement of decision will be deemed adequate "if it fairly discloses the determinations as to the ultimate facts and material issues in the case." (*Central Valley General Hosp. v. Smith* (2008) 162 Cal.App.4th 501, 513; *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379-1380.)

Our review is limited. "Where a statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358; *Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.) However, if the statement of decision "does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634.)

Plaintiff does not dispute the trial court's statement that his causes of action were all based on agency, conspiracy, or aiding and abetting. Nor does he take issue with the

6

adequacy of the court's explanation of its reasoning with regard to those theories. At most plaintiff asserts, without a developed argument, that the court's findings on agency, conspiracy, and aiding and abetting are unsupported by substantial evidence. His focus is primarily on the elements of the underlying causes of action, not the court's explanation of the factual and legal basis of its decision. If, however, the court's findings on each theory are supported by substantial evidence, then the conduct alleged in the complaint cannot be attributed to Chew even if his co-defendants, World Marketers and McCord, committed all of those unlawful acts. We therefore examine the viability of each theory, reviewing the record in light of the proper standards of review.

2. *Sufficiency of the Evidence*

At trial plaintiff testified that in the approximately two dozen meetings he had with McCord or presentations he attended in 2008, McCord represented that he had a lawyer who was going to litigate to get plaintiff's house back. McCord did not, however, give the lawyer's name.

Chew, representing himself, testified that the extent of his involvement with World Marketers was in drafting complaints for McCord, for which he received $800 per complaint.[5] He received no other income attributable to the clients of World Marketers. He was not McCord's partner, and he did not engage in any fee-splitting arrangement with McCord.[6] He was not hired to represent any of World Marketers' clients, and he

---

[5] Plaintiff 's counsel represented that he had "information from Mr. McCord" that Chew was actually paid $1,500, not $800, for every $2,500 client payment. Plaintiff sought an evidentiary sanction against Chew, who could not find a copy of the check he received, in the form of a finding that the amount was in fact $1,500. The court granted the motion without opposition. Chew nevertheless insisted that if he received $1,500, it was for two separate cases, not one. He would never have charged so little to initiate litigation.

[6] Plaintiff took the position that Chew received "substantially more" than $1,500, the amount of the evidentiary sanction. Relying on Chew's denial that he had a fee agreement with McCord because the amount exceeded $1,000, plaintiff argued that "this was a joint enterprise and that they were splitting these fees."

was not asked to draft its marketing materials. The FAQs World Marketers had distributed to prospective clients were, Chew suspected, "cut and pasted" from his website, which advertised Chew's own loan litigation services. Chew thought it might have been McCord's girlfriend who took the information from his website.

Plaintiff questioned Chew extensively about misstatements in Chew's website FAQs, but the court appropriately commented that it saw no "nexus between the information that is put on [Chew's] website and any element of reliance by [plaintiff]," particularly since there was no evidence that plaintiff ever saw the marketing statements made to the public by Chew on his website. Plaintiff's counsel acknowledged that the questioning about misstatements was aimed only at impeaching Chew's testimony. Counsel called it "professional suicide" to make those "false and misleading" statements to the public.

It was World Marketers' marketing materials, not Chew's, that contained the *relevant* false promises that its clients would be represented by an attorney in court as part of the foreclosure delay or mortgage referendum program. Although plaintiff sought to show that Chew was involved in *creating* those materials for World Marketers, the court excluded hearsay testimony offered by plaintiff's counsel to show that fact. Chew adamantly denied that he gave the FAQs from his website to World Marketers to enable the company to provide them to its clients. The court actually found Chew's testimony "at times purposefully sketchy and/or evasive," as was that of McCord. It acknowledged that plaintiff was "undoubtedly disadvantaged by Defendants McCord and Chew's less-than-forthcoming answers to questions in key areas." Nevertheless, it found that it "[could not] substitute its skepticism about witness credibility for persuasive countervailing evidence on the issue of liability."

Plaintiff accepted the trial court's suggestion that the asserted liability of Chew for fraud was based on agency. Responding to the court's inquiry, he explained, "The agency relationship is that they met together; they have had these meetings; they've talked about

8

the formation of World Marketers; and that Mr. Chew is to prepare the [consulting] contract. . . . And additionally that Mr. Chew prepared [the FAQs] . . . ." Plaintiff argued that after Chew created "the false and misleading" information, McCord, as Chew's agent, provided it to the consumers. Chew then benefited from his misrepresentation by receiving money from the clients who relied on the promise of an attorney. Plaintiff asked the court to discredit Chew's testimony that the FAQs were derived from his website, because Chew had not retained any record of that material, which he had since removed. Indeed, plaintiff characterized Chew's representation as not credible, because "this information [in the FAQs] is so wild—really false statements—that it is not credible that he put it on the web. . . . And . . . not only does it make no sense for Mr. Chew to put it on his website, it makes perfect sense for the document to have been created for World Marketers."

Plaintiff agreed with the court that the second, third, fourth, and fifth causes of action were all, like the fraud cause of action, based on an agency relationship between Chew and World Marketers.[7] That agency relationship was derived from the joint venture alleged in the 12th cause of action. The sixth cause of action (racketeering), according to plaintiff, was shown by "one fraudulent scheme with multiple predicate acts." The seventh cause of action for aiding and abetting consisted in "an allegation that each Defendant aided and abetted in the wrongful conduct that is alleged in other causes of action." As to the ninth cause of action for breach of Chew's fiduciary duty to provide legal services, plaintiff argued that Chew had created a fiduciary duty by creating the marketing document, by oral representations (presumably those of McCord), and by sending the March 11, 2009 retention letter. The same three grounds were asserted to

---

[7] The court asked plaintiff's counsel hypothetically whether there would still be liability absent an agency relationship, if an attorney did prepare documents for a client to be used in the client's business. Counsel replied that if the attorney knows the document will be provided to third parties, it must be accurate, or the attorney will be liable.

9

support the 15th cause of action for negligence. Similarly, the 10th cause of action for bad faith was based on a "special relationship" created through Chew's written promises and "the oral representations that his agent made." The 11th cause of action for money had and received, the 14th cause of action for intentional infliction of emotional distress, and the 15th cause of action for negligence were likewise predicated on the written and oral representations.

"The existence of agency is a question of fact for the trial court." (*Burr v. Capital Reserve Corp.* (1969) 71 Cal.2d 983, 995.) Plaintiff argued that McCord and Chew "intended to act on each other's behalf." According to plaintiff, Chew approved of McCord's conduct both before and after McCord made misrepresentations to the public and "accepted the benefits of the illegal enterprise." Even if not an actual agent, plaintiff argued, McCord was Chew's ostensible agent, because Chew "intentionally or carelessly created the impression that . . . his [legal] services were going to be provided."

The trial court, however, found no evidence that McCord was Chew's agent, whether actually, ostensibly, or by ratification.[8] It was McCord, the court reasoned, who was "by all indications 'the principal' in the operation of the foreclosure delay program and the mortgage investment referendum sponsored by World Marketers." Both programs were "established, marketed, and operated" by McCord, who contracted directly with program participants and made no statements purporting to represent Chew

---

[8] "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.) Ostensible authority must be established through the acts or declarations of the principal and not the acts or declarations of the agent. (*People v. Surety Insurance Co.* (1982) 136 Cal.App.3d 556, 562; *Lindsay-Field v. Friendly* (1995) 36 Cal.App.4th 1728, 1734.) An agency may also be created by ratification (Civ. Code, § 2307), but "only in the manner that would have been necessary to confer an original authority for the act ratified, or where an oral authorization would suffice, by accepting or retaining the benefit of the act, with notice thereof." (Civ. Code, § 2310.)

10

"in any program-related capacity." Chew "did not generally have any direct contact with program participants." He "prepared only a small number of civil 'pro per' complaints for program participants and did so only at Defendant McCord's direction." He was not engaged in a fee-splitting arrangement with McCord, but instead was paid "only a flat fee for each civil complaint with no percentage of business profits."

Addressing ostensible agency, the court further explained that "[t]here were no actions [that] would have reasonably given Plaintiff the impression that Defendant McCord was Defendant Chew's agent. Plaintiff admitted that he had no contact with Defendant Chew prior to signing the contract with Defendant McCord/World Marketers. Therefore, Plaintiff did not rely on Defendant Chew's representations or conduct in deciding whether to sign up for the foreclosure delay program or the mortgage investment referendum. Likewise, the evidence at trial did not establish 'agency by ratification.' A principal cannot ratify the act of the alleged agent, unless the 'agent' purported to act on behalf of the principal. . . . Here, there was no evidence that Defendant McCord held himself out as Defendant Chew's agent."

On appeal, plaintiff argues that "[i]t is undisputed [that] Chew knew McCord was promising fraudulent and illegal in-court attorney representation" and "[i]t is undisputed [that] Chew received benefits form [*sic*] the agency, legal work from the solicitation." As to ostensible agency, plaintiff contends only that Chew "intentionally or carelessly created the impression that McCord/World was Chew's agent, and that [plaintiff] reasonably believed Chew was McCord/World Marketers' agent. It is undisputed [that] Chew knew McCord was promising in-court legal representation, and that his Law Firm was the promised representation. Appellant reasonably believed such legal services would be provided, and Chew the one to provide them." And on the subject of ratification, plaintiff again argues, "It is undisputed [that] Chew learned of McCord/World's conduct after it occurred, and approved, of it. . . . It is undisputed [that] Chew knew McCord was promising fraudulent and illegal in-court attorney

11

representation. . . . It is undisputed [that] Chew received legal work from the solicitation, there was a fee splitting arrangement, and Chew accepted and kept the consumers' monies, even after learning [that] the promised in-court representation was not going to be provided."

To accept these arguments, however, would require us to completely disregard the time-honored principle that when findings of fact are challenged on a civil appeal, "the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) We must therefore "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court. (*Ibid.*)" (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) Moreover, findings of fact are liberally construed to support the judgment. (*In re Estate of Young*, *supra*, 160 Cal.App.4th at p. 76.)

In his appellate brief plaintiff offers a skewed depiction of the predicate facts, calling them "undisputed." Not only was his view disputed, however, but it was expressly rejected in key respects by the court as trier of fact. Plaintiff "seems to want this court to reevaluate [Chew's] credibility and reweigh the evidence presented below, but we can do neither. [Citations.]" (*Foust v. San Jose Const. Co., Inc.* (2011) 198 Cal.App.4th 181, 188; see also *In re Estate of Young*, *supra*, 160 Cal.App.4th at p. 76 ["We may not reweigh the evidence and are bound by the trial court's credibility determinations"].)

Having implicitly found Chew's testimony -- which was corroborated in significant details by McCord -- credible on this issue, the trial court found insufficient proof that any agency relationship had been established between Chew and McCord. Plaintiff fails to convince us that this conclusion was unsupported by substantial evidence.

12

The trial court's next finding, that plaintiff failed to prove a conspiracy to defraud plaintiff through the foreclosure delay program, was based on the lack of evidence that Chew had "any appreciable involvement in the operation of the mortgage investment referendum or that he derived any economic benefit from it." The court also noted that plaintiff had failed to prove that Chew "intended to join with Defendants McCord/World Marketers in a scheme to defraud Plaintiff via the foreclosure delay program. The evidence established that Defendant Chew merely agreed to draft 'pro per' complaints for defaulting homeowners at Defendants McCord/World Marketers' behest with the goal of delaying the foreclosure process. While Defendant Chew drafted the marketing materials for the foreclosure delay program, the evidence fell short of convincingly establishing that he knew of Defendants McCord/World Marketers' plan to mislead homeowners about the spectrum of legal services provided by the program."

Plaintiff does not offer any sound basis for overturning these findings. His entire argument on this theory is that "[i]t is undisputed [that] Chew and McCord hatched a program to solicit monies based on promised legal representation in-court [*sic*], and then failed to provide it. It is undisputed [that] they agreed [to] funnel legal business through a nonlawyer entity. A conspiracy can be inferred from the circumstances. There is no substantial evidence that a conspiracy was not created, and the undisputed facts support a De Novo review finding of conspiracy."

Plaintiff's argument is flawed for multiple reasons. A de novo review would clearly be improper. Whether a conspiracy *can* be inferred is immaterial, since the trial court's own reasonable inference to the contrary is entitled to deference. Finally, the facts on which the conspiracy theory is premised were anything but "undisputed"; on the contrary, the allegation that Chew and McCord together "hatched" this scheme was vigorously disputed by Chew at trial; nor did Chew ever accept plaintiff's portrayal of him as a participant in a plan to "funnel" his legal business through World Marketers.

13

Plaintiff's position on aiding and abetting also cannot survive scrutiny. The seventh cause of action in his complaint did not identify a *specific* wrong that Chew aided and abetted but referred generally to all of the "wrongful conduct" described in the previous six causes of action. Thus, aiding and abetting was a *theory* of liability for the fraud and statutory violations alleged against all three defendants.

Liability for aiding and abetting an intentional tort may be imposed on a defendant who "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 846.) On appeal, plaintiff again points to "undisputed" facts that either were not relevant to Chew's liability or actually were disputed and eventually found not to be true. For example, whether Chew knew that the marketing materials and contract were going to be used to solicit clients for the foreclosure delay program does not compel an inference either (1) that he knew McCord intended to defraud plaintiff, commit elder abuse, or violate other statutes protecting consumers like plaintiff; or (2) that he assisted or encouraged McCord to do so.

Likewise, plaintiff misstates the record by contending that it was "undisputed" that Chew created the marketing materials for the foreclosure delay program. This factual assertion was steadfastly disputed by Chew; and although Chew's testimony was found questionable by the trial court, its skepticism did not vitiate its finding that Chew did not give "substantial assistance or encouragement to Defendants McCord/World Marketers to wrongfully take Plaintiff's monies. As discussed above, Defendant Chew's involvement with the foreclosure delay program was limited to developing marketing materials and drafting several 'pro per' complaints for program participants. Defendant Chew had little or no involvement with the mortgage investment referendum and did not take an active role in the ongoing operations of the foreclosure delay program. Moreover, the evidence

14

at trial did not support a contention that Plaintiff relied upon the marketing materials prepared by Defendant Chew in making the decision to participate in the foreclosure delay program and/or the mortgage investment referendum. Rather, Plaintiff testified that he relied upon the oral representations made by Defendant McCord during the course of multiple program seminars which he attended. There was no evidence to suggest that Defendant Chew took an active part in or even attended the seminars that induced Plaintiff to sign up for the foreclosure delay program and the mortgage investment referendum."

None of plaintiff's slanted, unsupported assertions that facts were "undisputed" assists him in confuting the trial court's clear statement of its conclusions on plaintiff's aiding and abetting theory. Having been offered no sound basis on which to overturn the court's resolution of this issue, we must uphold it as supported by substantial evidence presented at trial.

It would be easy to defer to any factual finding that McCord and World Marketers deceived and misled clients like plaintiff in the promises they made in their program materials. McCord's own deposition testimony, often supercilious in tone yet equivocating, would alone have supported such a conclusion. But the misconduct of Chew's co-defendants is not at issue in this appeal. The trial court found that the conduct of McCord and World Marketers was not attributable to Chew. Plaintiff failed to meet his burden of proof below, and he has not met his burden on appeal to show error. Because the trial court's findings are supported by substantial evidence, whether this court would have reached the same conclusion is immaterial.

*Disposition*

The judgment is affirmed.

15

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.